**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRAIG SPRING,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TROOPER RYAN WATERS,** *et al.*, | : | |
| *Defendants.* | : | **No.  23-cv-4883** |

**MEMORANDUM**

**KENNEY, J.**                                                    **November 24, 2025**

Defendants Trooper Ryan Waters and Trooper Tara Gassenmeyer move for summary judgment on Plaintiff Craig Spring's claims (ECF No. 43). For the reasons set forth below, this Court will **GRANT** Defendants' Motion.

## I.    BACKGROUND

### A. Factual Background

At approximately 11:30 p.m. on December 14, 2021, Cristina Spring, the wife of Plaintiff Craig Spring, called the police. *See* ECF No. 44 ¶ 1; ECF No. 47-1 ¶ 1; *see also* ECF No. 42 (Stipulation of Facts, hereinafter "SOF") ¶¶ 7, 12. She placed this call when Plaintiff began to experience a panic attack after consuming new medication and two to three cocktails, SOF ¶¶ 6–7, broke the refrigerator door handle out of agitation, *see id.* ¶ 12; *see also* ECF No. 43-8 at 17, and started "pacing and screaming" outside their home, ECF No. 43-4 at 01:10–01:15. Mrs. Spring told the operator that Plaintiff had "a lot" to drink that night, ECF No. 43-3 at 00:38–00:42, and that he was "very upset mentally," ECF No. 43-4 at 00:34–00:42, and "mentally unstable," ECF No. 43-3 at 00:57–01:07. When the operator asked if Plaintiff would "give any sort of . . . fight" when troopers arrived, Mrs. Spring responded "probably, yes." ECF No. 43-4 at 01:16–01:26.

There were four guns in the Spring residence at this time. SOF ¶ 10. Mrs. Spring told the operator that she did not believe the weapons were secured, *see* ECF No. 43-4 at 00:01–00:11, although she had not seen Plaintiff carrying any weapons when he exited the home, *id.* at 01:00–01:15, and she stated she "c[ould] try" to secure any weapons before Defendants, who were "very close" at that point, arrived, ECF No. 43-5 at 00:01–00:21.

When Defendants were going to arrive "any minute," Mrs. Spring stated Plaintiff was in "dire mental straits" and that she no longer knew where he was. *See* ECF No. 43-6 at 00:14–00:42. She stated she did not feel unsafe with him but later expressed to the operator that he had made comments about harming himself. *See id.* at 0:44–00:58, 03:06–03:17. She then relayed to the operator that some troopers had arrived at the scene and that she could overhear Plaintiff "yelling at them" and that he sounded "angry." *Id.* at 05:33–06:10.

At this time, Defendants Troopers Waters and Gassenmeyer arrived at the residence. *See id.*; ECF No. 43-10 at 6. They had been dispatched to the scene to respond to an "active domestic" incident and were told of the call between Mrs. Spring and the 911 operator, including that Plaintiff was intoxicated, that he was experiencing a "mental break," that there were unsecured weapons in the house, ECF No. 43-9 at 6, and to anticipate a physical fight, ECF No. 43-10 at 6.[1] When Defendants arrived, Plaintiff was at the top of the stairs leading to the residence's back deck, SOF ¶ 14, which was connected to the house by a sliding door, ECF No. 43-8 at 13.

As Defendants approached the stairs, they identified themselves as troopers and asked Plaintiff to come down from the deck to speak with them. SOF ¶¶ 16–17. Plaintiff refused to come down and told Defendants to come to the deck. *Id.* ¶ 17. Defendants asked Plaintiff to come down

---

[1] Plaintiff testified that the firearms were in actuality secured. ECF No. 43-8 at 15. However, it is undisputed that Mrs. Spring informed the dispatcher that the firearms were not secured. ECF No. 43-4 at 00:01–00:11.

at least one more time, *see* ECF No. 43-8 at 21, after which Plaintiff stated, "F this, you can guys run out front, we'll talk inside," *see* SOF ¶ 18. Plaintiff then motioned to the door of the home, and Defendants instructed him to freeze and ascended the stairway. *Id.* ¶¶ 19, 22; ECF No. 43-8 at 22–23. In response, Plaintiff lifted up his shirt, under which there were no weapons visible, SOF ¶ 20, and exposed his torso, raised his hands in the air, and turned his back to Defendants.[2] *See* ECF No. 43-8 at 22–23. Plaintiff also testified that he removed the contents of his pockets. *Id.* at 21.

The Parties dispute whether Defendant Waters instructed Plaintiff to put his hands behind his back, ECF No. 43-10 at 10–11, or up in the air, ECF No. 43-8 at 23. Regardless, Defendant Waters then grabbed Plaintiff's left arm and placed a handcuff on it, ECF No. 43-8 at 23; *see* ECF No. 43-10 at 7, and Defendant Gassenmeyer grabbed Plaintiff's right arm, *see* ECF No. 43-10 at 11; ECF No. 43-9 at 7. Plaintiff testified that he then said, "Why am I being put in handcuffs," turned his head, and pivoted at the hip toward Defendants.[3] ECF No. 43-8 at 23.

As Plaintiff pivoted, Defendant Gassenmeyer performed a drive stun to Plaintiff's hip using her taser, *see* ECF No. 43-9 at 7–8, though the drive stun—which lasted approximately half a second, *id.* at 8—was undisputedly not effective, SOF ¶ 24.[4] Simultaneously, or immediately after, Defendant Waters took Plaintiff—whose right arm was still uncuffed—down to the ground. ECF

---

[2] Defendant Waters testified that he asked Plaintiff if he was armed prior to this. ECF No. 43-10 at 10. Plaintiff did not mention being asked if he was armed and instead testified that he lifted his shirt after being directed to freeze. *See* ECF No. 43-8 at 21, 23.

[3] There is a factual dispute about Plaintiff's conduct at this time. For instance, Defendant Waters testified that Plaintiff "pulled away from [him] and tried walking towards the back door of the house" during the attempted handcuffing and "continued to try to pull away from [the troopers]" during the events that followed. However, at the summary judgment stage, the Court views the facts in the light most favorable to Plaintiff and credits his account. *See Le Pape*, 103 F.4th at 977.

[4] Use of a taser in drive stun mode causes localized pain to the area of the body against which the taser is pressed, but unlike other uses of a taser, it does not paralyze the individual's muscles. *See* ECF No. 43-10 at 7. The differences between drive stun mode and other modes of taser use—*e.g.*, dart mode—are discussed *infra* Section III.B.

No. 43-10 at 7–8; *see* ECF No. 43-8 at 23. Plaintiff testified that once on the ground, he felt "blows to [his] face and [his] back." ECF No. 43-8 at 23. Defendants then cuffed Plaintiff's hands together. *See id.*; ECF No. 43-10 at 8; ECF No. 43-9 at 9.

Following the above events, Plaintiff was taken to the hospital, from which he was discharged approximately two hours later. *See* SOF ¶ 25. At the hospital, he was diagnosed with a head injury and facial laceration, knee sprain, and a fracture to his finger.[5] ECF No. 43-8 at 27–28. Several months later, in March 2022, Plaintiff received surgery for knee injuries. *See id.* at 8, 11 (Plaintiff testifying that he was later diagnosed with a "torn ACL," "MCL tear," and "meniscus tear," and received surgery).

In connection with the above incident, Plaintiff ultimately pled guilty to a disorderly conduct charge. SOF ¶ 30.

### B. Procedural History

On December 11, 2023, Plaintiff brought this action under 42 U.S.C. § 1983 against Troopers Waters and Gassenmeyer (the "individual Defendants") and the Commonwealth of Pennsylvania and the Pennsylvania State Police (the "state Defendants"). *See* ECF No. 1 at 1. Plaintiff sued the individual Defendants for violations of the Fourth Amendment, the state Defendants for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and all Defendants under state law for assault, battery, and intentional infliction of emotional distress. *Id.* at 6–7, 9. Plaintiff alleged that, based on the incidents giving rise to his suit, he required knee surgery, has a permanent scar over his eye, and cannot fully straighten his middle finger. *Id.* at 5. Later, Plaintiff stipulated to dismissing the claims against the Commonwealth of Pennsylvania, ECF No. 8 at 1, and the Pennsylvania State Police, *see* ECF No. 41 at 1.

---

[5] The hospital also provided Plaintiff with a full-length leg brace, instructed him to "rest/ice/elevate" his knee, and diagnosed him with hypertension. ECF No. 43-8 at 27.

The remaining Defendants, Troopers Waters and Gassenmeyer, subsequently moved for summary judgment. *See* ECF No. 43 at 2. In his opposition to Defendants' Motion for Summary Judgment, Plaintiff withdrew his state law claims. ECF No. 47 at 10. Accordingly, only Plaintiff's claims under the Fourth Amendment remain.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, this Court must view the facts "in the light most favorable to the non-moving party." *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 977 (3d Cir. 2024).

## III.    DISCUSSION

Plaintiff sues Defendants Waters and Gassenmeyer under the Fourth Amendment for excessive force.[6] ECF No. 1 at 6. Force is excessive under the Fourth Amendment if the officer's actions were objectively "unreasonable under the circumstances," considering the threat to the safety of the officer or others posed by the individual, any resistance by the individual, and the severity of the conduct at issue. *See El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (citation omitted).

Defendants move for summary judgment on Plaintiff's Fourth Amendment claims based on qualified immunity, ECF No. 43 at 13–17, which shields officials from liability for damages when their conduct "does not violate clearly established statutory or constitutional rights." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11

---

[6] Plaintiff's Complaint also referred to Defendants' conduct as an unreasonable seizure. ECF No. 1 at 6. However, Plaintiff's summary judgment papers refer to this claim only as an "excessive force claim," and they do not argue that Plaintiff is bringing a distinct, freestanding Fourth Amendment seizure claim. *See, e.g.*, ECF No. 47 at 11.

(2015) (per curiam)). To prevail on a motion for summary judgment based on qualified immunity, a defendant must show either that (1) the conduct at issue, when viewed in the light most favorable to the plaintiff, did not violate a constitutional or statutory right or (2) that such a right was not clearly established at the time of the incident. *See Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021). Courts may address these prongs in either order, and either prong suffices to establish qualified immunity. *Peroza-Benitez*, 994 F.3d at 165. And because "[q]ualified immunity is an individual defense," courts must "independently analyze the conduct of each officer" to determine if that officer is entitled to qualified immunity. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 n.29 (3d Cir. 2023).

The second prong—whether any right being violated was clearly established at the time of the incident—is dispositive for both Defendants here. Courts must define the right based on the "particular conduct" at issue," rather than "at a high level of generality." *Mullenix*, 577 U.S. at 12 (emphasis omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Such a right is clearly established when the right is "'sufficiently clear,' [so] that every 'reasonable official would [have understood] that what he is doing violates [it].'" *al-Kidd*, 563 U.S. at 741 (first alteration in original) (citation omitted). That analysis turns on whether case law, even if it does not present identical facts, has placed that specific constitutional or statutory right "beyond debate." *See Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (quoting *al-Kidd*, 563 U.S. at 741). And to make that determination, this Court must look to Supreme Court precedent, Third Circuit controlling authority, or a "robust consensus of cases" from other federal courts of appeals. *Id.* (citation omitted).

With those principles in mind, the Court turns to each Defendant's conduct.

**A.  Defendant Waters**

While attempting to handcuff Plaintiff, Defendant Waters took Plaintiff down to the ground. ECF No. 43-10 at 8; *see* ECF No. 43-8 at 23. Plaintiff testified that after he was taken to the ground, and before his hands were cuffed together, he felt "blows to [his] face and [his] back." ECF No. 43-8 at 23. It is unclear from the record which Defendant was responsible for these blows, but viewing the evidence in the light most favorable to Plaintiff, *see Le Pape*, 103 F.4th at 977, the Court will attribute the blows to both Defendants. And though the Parties dispute Plaintiff's level of resistance prior to the takedown, Plaintiff testified that while his left hand was being cuffed, he questioned why he was being handcuffed, turned his head, and pivoted at his hip. ECF No. 43-8 at 23. These actions occurred after Defendants were called to the scene to respond to an active domestic incident, were informed of there being unsecured firearms in the house, and were told Plaintiff was having a "mental break," had consumed alcohol, *see* ECF No. 43-9 at 6, 8; and was likely to fight the officers, *see* ECF No. 43-10 at 6; *see also* ECF No. 43-4 at 00:01–00:11, 01:16–01:26. These events also unfolded after Plaintiff had multiple times refused to descend from the deck—from which he could enter his home, *see* ECF No. 43-8 at 13; had attempted to get Defendants to go inside—where Defendants were told there were unsecured firearms, *see* ECF No. 43-9 at 6; and had motioned toward the door to his home. *See* SOF ¶¶ 16–19.

It is not clearly established that an individual who is reported to be intoxicated and likely to fight officers, and who has moderately resisted, has a right to be free from a takedown and some physical force to prevent him from gaining access to weapons. *See Jefferson*, 21 F.4th at 81 (defining a right at a similar level of specificity). Supreme Court, Third Circuit, and other federal appellate cases did not place such a right "beyond debate" in December 2021. *See Barna*, 877 F.3d at 142 (citation omitted). Though Plaintiff's level of resistance was not extreme, Plaintiff refused multiple orders to get down from the deck and continued to resist when he attempted to turn around

while being handcuffed and engage Defendant Waters. *See Harris v. Janes*, 820 F. App'x 677, 678 (10th Cir. 2020) (where a plaintiff was being handcuffed, referring to the plaintiff's turning around and attempting to engage officer as resistance); *see also Fischer v. Hoven*, 925 F.3d 986, 989 (8th Cir. 2019). Even if this level of resistance would not ordinarily justify a takedown, Defendants—who were called in for an active domestic dispute—were instructed that there were unsecured firearms in the house, that Plaintiff had had a lot to drink, and that he was likely to fight troopers. *See* ECF No. 43-10 at 6; ECF No. 43-9 at 6. And Plaintiff had made multiple attempts to get Defendants to go inside—where the firearms were located—and refused to talk outside. *See* SOF ¶¶ 16–18.

This Circuit has affirmed the grant of qualified immunity where officers have performed takedowns under similar circumstances. *Cf. Rivera v. Lake Como*, 733 F. App'x 587, 588, 590–91 (3d Cir. 2018) (takedown was a reasonable use of force under the first qualified immunity prong, where plaintiff was inebriated, resisted a handcuffing, and the officers' actions lasted a short amount of time); *Mierzwa v. United States*, 282 F. App'x 973, 975, 978–79 (3d Cir. 2008) (per curiam) (tackling, as well as other force, was reasonable where plaintiff demonstrated "animosity towards Defendants upon their arrival at the scene," "refused to comply with their requests that he . . . step to the curb," and flailed his arms during arrest); *Boroff v. Lynn*, 643 F. App'x 130, 133 (3d Cir. 2016) (takedown was a reasonable use of force where the plaintiff was "inebriated," "combative in a restricted area that opened onto [a] playing field," and had tried to evade officers multiple times). And the circumstances here required a rapid and urgent assessment of how to prevent Plaintiff from entering his home. Though there are other types of force that certainly would have been excessive in this situation, "every 'reasonable official'" in December 2021 would not have understood a takedown and some physical force, during an attempted handcuffing, to have

violated Plaintiff's constitutional rights. *See al-Kidd*, 563 U.S. at 741 (citation omitted). In light of the above, this Court will grant Defendants' Motion with respect to Defendant Waters.

### B. Defendant Gassenmeyer

The Court turns next to Defendant Gassenmeyer. It is undisputed that Defendant Gassenmeyer attempted a single "drive stun" on Plaintiff's hip using her taser, but that the stun "was not effective." SOF ¶ 24. She did so for half a second just as, or immediately before, Defendant Waters performed a takedown.[7] *See* ECF No. 43-9 at 8 (Defendant Gassenmeyer testifying that the drive stun was "simultaneous" and not coordinated with the takedown); ECF No. 43-10 at 11–12 (Defendant Waters testifying that the drive stun occurred just before the takedown); ECF No. 43-8 at 23 (Plaintiff testifying that the stun occurred "at the same time" as Plaintiff was "falling"). Prior to this, she also grabbed Plaintiff's right arm. *See* ECF No. 43-10 at 11; ECF No. 43-9 at 7. And as discussed above, this Court will also attribute the blows Plaintiff testified he experienced after the takedown but before his hands were cuffed together to Defendant Gassenmeyer, as well as to Defendant Waters. *See supra* Section III.A.

This Circuit, admittedly in an unpublished case, has found a clearly established right against the "use [of] a taser on an individual who is nonviolent, compliant, and poses no threat of danger." *See Minium*, 793 F. App'x at 150. However, courts have held that when an individual

---

[7] Defendant Waters testified that only he, not Defendant Gassenmeyer, took Plaintiff to the ground, and that as a result, all three parties fell to the ground. *See* ECF No. 43-10 at 12. Defendant Gassenmeyer offered similar testimony. *See* ECF No. 43-9 at 8 (testifying that "Trooper Waters attempted to [bring Plaintiff to the ground] and did so successfully"). Plaintiff does not discuss each Defendant's conduct individually, but he did not identify Defendant Gassenmeyer as responsible for the takedown during his deposition. *See* ECF No. 43-8 at 23. If anything, he testified that Defendant Gassenmeyer may have been "holding [him] up." *See id.* However, even if part of the takedown could be attributed to Defendant Gassenmeyer, it was not clearly established in December 2021 that, under these circumstances, such conduct violated Plaintiff's constitutional rights. *See Randolph-Ali v. Minium*, 793 F. App'x 146, 150 (3d Cir. 2019) (per curiam) (involving both the use of a drive stun and tackling).

disobeys or actively resists an officer, the use of a taser may be reasonable. *Id.* (citing cases). And this circuit, as well as others, have distinguished further between the use of tasers in drive stun mode and dart mode, observing that dart mode constitutes a more "significant level of force" than drive stun mode, because drive stun mode causes "incapacitating pain, but does not paralyze the entire body." *See id.*; *see also Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (describing drive stun mode as "typically caus[ing] temporary, if significant, pain and no permanent injury"); ECF No. 43-10 at 7 (Defendant Waters testifying that drive stun mode causes pain but, unlike using a taser with the probes deployed, does not cause "neuromuscular interlock").

Here, it was not clearly established that an individual who was reported to be intoxicated and likely to fight officers, and who has moderately resisted, has a right to be free from a brief and ineffective drive stun to prevent him from accessing weapons. Defendant Gassenmeyer attempted the drive stun after Plaintiff at least twice refused to descend from the deck and instead, directed Defendants to go inside his home, where firearms were located. *See* SOF ¶¶ 17–18; ECF No. 43-8 at 21; ECF No. 43-9 at 6. And just preceding the drive stun, Plaintiff had begun to pivot his hips and turn his head while Defendant Waters attempted to handcuff him. *See* ECF No. 43-8 at 23. As discussed above, *supra* Section III.A, these events occurred after Defendants were directed to respond to an active domestic incident and were warned that Plaintiff was inebriated and was likely to fight Defendants. *See* ECF No. 43-9 at 6, 8; ECF No. 43-10 at 6; ECF No. 43-4 at 00:01–00:11, 01:16–01:26.

Under these circumstances, Plaintiff—although not engaged in extreme resistance—was also not fully "compliant" and an officer could find that he posed a "threat of danger," given his ability to access multiple weapons if he gained entry to the house. *See Minium*, 793 F. App'x at 150. In this context, the Supreme Court, Third Circuit, and other federal courts of appeals do not

place the right to be free from a single drive stun "beyond debate." *See Barna*, 877 F.3d at 142 (citation omitted); *cf. Minium*, 793 F. App'x at 149 (concluding that the right to be free from a drive stun and tackling was not clearly established in the inverse situation—where the plaintiff refused to let officers "enter her home to ensure the safety of the home's occupants"); *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020) (observing that "it is reasonable for an officer to tase an uncuffed suspect [in drive stun mode] who appears to be resisting arrest"); *Alexander v. City of Shelby Twp.*, No. 07-CV-14741, 2009 WL 3241974, at *2 (E.D. Mich. Oct. 8, 2009) (granting summary judgment to officer on excessive force claim for single use of taser in drive stun mode where the plaintiff "had shown a belligerent attitude, threaten[ed] officers," and refused multiple requests).

Plaintiff points to several cases involving the use of tasers, but none squarely governs this case. *See* ECF No. 47 at 8–10. They involve substantially different circumstances, as well as greater uses of force. *See Shultz v. Carlisle Police Dep't*, 706 F. Supp. 2d 613, 621–23 (M.D. Pa. 2010) (involving a plaintiff who, after having a seizure, was tased multiple times when he attempted to push a medical gurney out of the way); *Reiff v. Marks*, No. 08-CV-5963, 2011 WL 666139, at *6 (E.D. Pa. Feb. 23, 2011) (involving a plaintiff who argued it was excessive for officers to tase him three *additional* times because the first taser effectively seized him); *Peroza-Benitez*, 994 F.3d at 163, 167, 172 (involving one officer who repeatedly punched an injured and unarmed plaintiff who was "h[anging] out of a second-story window" and another officer who tased the plaintiff in dart mode after the plaintiff fell from the window and lost consciousness); *Boyd v. Kissinger*, No. CIV.A.06-5628, 2008 WL 2550584, at *6 (E.D. Pa. June 26, 2008) (involving a plaintiff who was put in a choke hold, pulled by his hair out of a vehicle, and tased and stunned eight times); *Henry v. City of Philadelphia*, No. CIV.A. 09-1584, 2010 WL 3927638,

at *5 (E.D. Pa. Sept. 30, 2010) (factual dispute existed about whether a decedent, who was ultimately fatally shot, had access to a kitchen knife and posed a threat to officers); *Buchanan v. W. Whiteland Twp.*, No. CIV. A. 08-462, 2009 WL 54949, at *3 (E.D. Pa. Jan. 7, 2009) (where a plaintiff was tased twice, factual dispute over whether she was tased before or after revving her car engine precluded summary judgment); *Caliguiri v. City of Pittsburgh*, No. CIV.A. 07-1133, 2009 WL 1546325, at *2 (W.D. Pa. June 2, 2009) (plaintiff who was tased and bitten by a police dog disputed, among other things, whether she walked behind a police line during a demonstration); *Wilhere v. Delaware County*, No. CIVA 09-22, 2010 WL 1381664, at *1, 6 (E.D. Pa. Apr. 1, 2010) (officer applied taser to plaintiff's groin area, about which sheriff's manual had distinct policies, while plaintiff was participating in a strike). And, with respect to the district court cases to which Plaintiff points, they cannot themselves clearly establish a constitutional right, regardless. *See Barna*, 877 F.3d at 142 (observing that rights are clearly established by Supreme Court precedent, Third Circuit authority, or a consensus of other circuits' cases).

This Court is mindful that Defendants used force after Mrs. Spring told the operator that Plaintiff was "mentally unstable," ECF No. 43-3 at 00:57–01:07, and after Defendants were told Plaintiff was experiencing a "mental break." ECF No. 43-9 at 6. Officers should take great care in responding to individuals, like Plaintiff, who are experiencing mental health episodes, given that these individuals may be in significant distress themselves and whose circumstances pose distinct considerations. Nor is this opinion intended to address whether this type of force would be appropriate in other circumstances involving individuals experiencing mental health conditions. It is only to say that in December 2021, Supreme Court precedent, Third Circuit authority, and a consensus of other circuits' cases did not place "beyond debate" whether each Defendant's actions rose to the level of a violation of the Constitution. *See Barna*, 877 F.3d at 142 (citation omitted).

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 43) will

be **GRANTED**. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**